BOUTWELL, Appellant, v. GLOBE & RUTGERS FIRE INS. CO. OF CITY OF NEW YORK, Respondent. (Supreme Court, Appellate Division, First Department. January 11, 1907.) Appeal from Judgment on Report of Referee. Action by William A. Boutwell against the Globe & Rutgers Fire Insurance Company of the city of New York. From a judgment entered on the decision of a referee dismissing the complaint, plaintiff appeals. Affirmed. George Whitefield Betts, Jr., for appellant. Frederic R. Coudert (John P. Murray, on the brief), for respondent.

PER CURIAM. Judgment affirmed, with costs.

LAUGHLIN, J. (dissenting). This is an action on an assigned claim for fire insurance. The assignor of the assignor of the plaintiff, one Moore, owned the steam dredge, Mobile, which was in Savannah Harbor. He also owned various other steam dredges. One Thomason, a broker, represented Moore in procuring insurance on his dredges. On the 7th day of January, 1902, Moore, being of the impression that a $5,000 policy on the Mobile, issued by the Phœnix Company, had been canceled, and that certain policies insuring his steam dredge Fairplay, which was also at Savannah, were void, wrote Thomason among other things: "I wish policies amounting to $10,000 on the Mobile and Fairplay, as $10,000 on each dredge is all I care to carry at present. I have one policy now, No. 2,679 Phœnix, expiring 6/19/'02, though I do not know whether this has been canceled or not. You have all the other policies. Please send policies to me here as early as possible, and inform me when they are placed. * * * Would also like to have a memorandum showing what insurance you have of mine and when expiring." The testimony of Thomason is conflicting. He testified both that the records in his office show that a Phœnix policy for $5,000 on the Mobile had been canceled, leaving, according to his records, only $5,000 insurance on the Mobile, and he also testified that his records showed that the policy had not been canceled. His testimony is also somewhat uncertain as to

whether he applied for and obtained new policies in the belief that the Mobile was only insured for $5,000, or whether he was uncertain on that point, and obtained the insurance as a matter of precaution. However, in what he did the inference is plain that he was endeavoring to carry out the instructions of his principal, and with that in view, on or about the 6th day of February, 1902, he applied to Messrs. Jameson & Freylinghuysen, who were the agents of the defendant and of the Manufacturers' Lloyds Company, for $2,500 additional insurance on the Mobile in each company, and he obtained a binding slip from each, and subsequently received the policy from the Manufacturers' Lloyds. Thomason evidently wrote Moore on the 8th of February, 1902, inclosing some policies. The letter, however, is not in the record. On the 10th of February, 1902, Moore wired Thomason: "All policies received your letter eighth were canceled by companies; have they been reinstated? One policy for twenty-five hundred Fairplay expired January 27th. Is ten thousand in force on each dredge Fairplay and Mobile?" And on the same day addressed him by mail, asking if he had had the policies which were canceled reinstated, and saying: "I have policies amounting to $6,000 on dredge Fairplay and $5,000 on dredge Mobile. I have also policy No. 2,697 Phœnix of Brooklyn for $5,000 on dredge Mobile that was canceled by the company on October 29, 1901. Have you had this reinstated? Would like to get this matter straightened out, as it is very annoying now trying to understand the matters, as it has been over a month since you received this money for this insurance. Am wiring you tonight in regard to this matter, though from your previous letters I understand you have bound all the insurance asked for—that is, $10,000 on each of the dredges Fairplay and Mobile, and am just waiting to get the policies." Upon receipt of the telegram and letter, Thomason, being unable to determine definitely from the records in his office, consulted the agents for the various insurance companies, to ascertain the status of Moore's insurance, as a result of which he ascertained that the Phœnix policy for $5,000 either had never been canceled or had been reinstated, and that there was then $10,000 insurance on the Mobile in addition to the new insurance of $5,000, for which he then held the policy of the Manufacturers' Lloyds and the binding slip issued by the defendant. He thereupon on the 13th day of February wired Moore: "The companies advise me ten thousand in force each dredge," and wrote him at Mobile, Ala., on the same day more fully concerning the delay in ascertaining and communicating the information, and inclosed a statement of insurance on the dredges saying, "I am holding you covered for $10,000 on each dredge. In fact, on the Mobile I have been $5,000 over, but this policy I shall mark off." Thomason, immediately upon discovering that he had taken out more insurance than was needed, caused the Manufacturers' Lloyds policy to be returned to the agents of the defendant, who were also the agents of that company, with an indorsement thereon "Not wanted," and the binding slip issued by the defendant with the indorsement thereon "Mark off." The policy and binding

slip were received by the agents of the defendant on the 14th day of February, and retained until the 15th, when they were returned, together with the policy issued by the defendant, in accordance with the binding slip, inclosed with a letter as follows: "We are in receipt of the inclosed binders and policies No. 51,573 of the National and 44,613 of the Globe. Policies for both of these binders have been issued, and we request you to either retain the inclosed policies, or explain to us why it is necessary for you to return them. Yours truly, C. V. M. P. S. We inclose you also policy No. 24,901 of the Manufacturers, and beg to advise you that we will not mark these policies off, but will cancel same short rate, and bill you for the earned premium for the time the same has been in force. Yours very truly, Jameson & Frelinghuysen." The 15th was Saturday, and this letter, inclosing the policies and the binding slip, was not received by Thomason until Monday, the 17th. In the meantime, and at 3 o'clock on the morning of the 15th, the Mobile was destroyed by fire. The agents of the defendant, upon learning that the fire had taken place, demanded that Thomason return the policies, but he refused to comply with their demand, and turned the policies over to his principal, who, after tendering the premium to the company, and duly presenting proofs of loss, assigned the policy and his claim thereunder to one Swan, who in turn assigned the same to the plaintiff. The policy contained a provision with respect to cancellation common to all fire insurance policies, as required by the laws of New York, as follows: "This policy shall be canceled at any time at the request of the insured, or by the company by giving five days' notice of such cancellation. If this policy shall be canceled as hereinbefore provided, or become void or cease, the premium having been actually paid, the unearned portion shall be returned on surrender of this policy or last renewal, this company retaining the customary short rate; except that when this policy is canceled by this company by giving notice it shall retain only the pro rata premium."

Section 122 of the insurance law (chapter 690, p. 1981, Laws 1892) provided, among other things, that: "Any corporation, person, company or association transacting the business of fire insurance in this state shall cancel any policy of insurance upon the request of the insured or his legal representative, and shall return to him or to such representatives the amount of premium paid, less the customary short rate premium for the expired time of the full term for which the policy has been issued or renewed, notwithstanding anything in the policy to the contrary." The learned counsel for the respondent contends that, by virtue of the provision of the policy and of the statute quoted, the return of the binding slip by the broker of the insured, with the indorsement "mark off," constituted a cancellation of the policy ipso facto, without any action on the part of the company and without its approval or consent. It undoubtedly rested with the insured at any time, by virtue of these provisions, to cancel the policy, and the Court of Appeals long since, under similar provisions, so held. Crown Point Iron Co. v. Ætna Ins. Co., 127 N.

Y. 608, 28 N. E. 653, 14 L. R. A. 147. The question here presented, however, is whether the action of the insured clearly showed an intention on his part to cancel the policy. The cancellation contemplated by the provision of the policy quoted and by the statute is a termination of an existing contract, which the insured by his request for cancellation recognizes as having been in full force and effect to the time of cancellation; and he becomes liable to the insurance company for the premium at the higher rate prescribed for short term insurance for the period during which the policy was in force. This, is quite evident, was not the intention of the insured, as manifested by the act of his broker. What he desired was to have the insurance company consent to mark the policy off its books as if the same had never been issued, in which event he would not be liable for any premium. It is manifest that the agents of the company so understood the request, for they refused to accept the suggestion to mark the policy off, and not only returned the binding slip but the policy itself, which they had in the meantime executed in accordance with the binding slip, and in the letter returning it they expressly declined to abrogate the contract ab initio, but manifested a willingness to cancel it upon the basis of their receiving a premium at the short term rate. The policy bears date the 14th day of February, the day the agents of the company received the binding slip back from Moore's broker with the indorsement "mark off"; but whether it was made out before or after the receipt of the binding slip by the agents of the company does not appear. I think that the language employed clearly indicated that what the broker desired in behalf of his principal was to notify the insurance company, not that this insurance was no longer wanted, but that it was not wanted originally, and that it had been ordered through mistake or otherwise. It appears by the testimony of the broker for the insured and of a confidential clerk of the agents of the company that the terms "not wanted" and "mark off" are used by insurance brokers synonymously. The broker for the insured, however, testified that they are used in contradistinction to the term "cancellation," when it is desired to have the policy marked off as if it had never been issued, and without any charge for premium. The confidential clerk of the agents for the company testified that they are used when the insured has determined to cancel the policy, and that they constitute a request that it be canceled without charging any premium for the time that it was in force. This view does not seem reasonable, and is impeached by the action of the agents of the company in returning the policy. If they had understood from the words employed that the insured had determined to cancel the policy, and merely requested that the cancellation be without any charge for premium, they would have accepted the cancellation of the policy, and if they did not feel warranted in canceling it without making a charge for the premium, they would have notified him to that effect.

The respondent contends that it is unfair to put a construction upon the transaction which gave the insured the option, after he knew that the loss had occurred, to accept the policy, and thereby ratify the action of his broker, which may have been unauthorized. On the facts of this case it does seem that the insured obtained an advantage, but it is attributable to the action of the agents of the company. They might have accepted the return of the binding slip as a cancellation of the policy, and have asserted a claim in behalf of their principal for the high rate insurance for the period that the binding slip had been in force, and if they are right in the construction for which they now contend, the only question that could then have arisen would have been whether the company was entitled to the premium. This they did not do. They took the position that the policy was in force, and that it continued in force until some further action on the part of the insured. If, therefore, the action of the broker did not ipso facto cancel the policy, it remained in force, and the insured was at liberty to accept the return thereof, as he did. He could not have received his broker's letter informing him that by mistake overinsurance had been taken out on the Mobile until after the fire, so that he had no opportunity of either approving or disapproving the action of the broker in returning the binding slip; but he promptly accepted the action of the agents of the company in declining to "mark off" the policy, and insisting that it remain in force, by retaining the policy and presenting proofs of loss almost immediately. In the circumstances it is not at all clear that the agent was not authorized to procure the insurance, but if he were not, the insured had a right, even after the fire (since that was the first time he had an opportunity to do so) to ratify the act of his broker, and accept the policy upon the theory that a subsequent ratification is equivalent to original authority. Story on Agency, § 445; Hagedorn v. Oliverson, 2 M. & Selw. 455; Excelsior Fire Ins. Co. v. Royal Ins. Co., 55 N. Y. 343, 14 Am. Rep. 271. It follows that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.